UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| KEYANA EDWARDS INDIVIDUALLY AND AS GUARDIAN OF DAMION HATCHER, | * * * * * | CIVIL ACTION |
| Plaintiff, | * * | DOCKET NO.: |
| v. | * * | |
| ND PAPER INC.; REPUBLIC SERVICES, INC., D/B/A ACV ENVIRO and CLEAN VENTURE, INC.; ZAMPELL REFRACTORIES, INC.; NEW ENGLAND MECHANICAL OVERLAY CONSTRUCTON SERVICES, INC.; and LABOR CLEANING SERVICE, INC. | * * * * * * * * * * | |
| Defendants. | * | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### Introduction

1. On May 28, 2025, 35-year-old Damion Hatcher plummeted 80 feet after falling into the opening of a chimney (depicted in the photograph below) while performing cleaning services during a shutdown at the Nine Dragons paper mill in Rumford, Maine, owned by Defendant ND Paper Inc. ("ND Paper").



1

2. Damion, a husband and father of four young children, suffered extensive, permanent, and life altering injuries in the fall. The photographs below show Damion before and after his injuries.



3. Damion's fall and injuries resulted from negligence, neglect, and callous and malicious disregard of workplace safety practices, standards and regulations by Defendants ND Paper, Republic Services, Inc., Zampell Refractories, Inc., New England Mechanical Overlay Construction Services, Inc. and Labor Cleaning Service, Inc.

4. Defendants' negligence included a lack of operational safeguards and appropriate facilities management that resulted in Damion being forced to work in an ultra-hazardous location without proper monitoring or fall-protection measures.

5. Had Defendants properly managed the risk, acted reasonably, and complied with accepted industry standards and safety practices, Damion would not have fallen into the open chimney, plummeted 80 feet, or suffered any significant injury.

6. Instead, because of Defendants' negligence, Damion has been left unable to walk, speak, or eat independently, stripped of his autonomy and the simple pleasures and experiences that once defined his life.

**Jurisdiction and Venue**

7. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because: (a) there is complete diversity of citizenship between Plaintiff and Defendants, and (b) the amount in controversy exceeds $75,000.

8. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391, because the actions complained of occurred in the State of Maine, Oxford County.

9. Plaintiff Keyana Edwards is the wife and legal guardian of Damion Hatcher. Keyana and Damion reside in Fort Wayne, Indiana.

10. Defendant ND Paper is a pulp and paper business with a principal place of business in Oak Brook, Illinois. At all times relevant to this action, Defendant ND Paper owned, operated, and controlled the Rumford paper mill and cogeneration facility ("the Mill") located in Rumford, Maine. ND Paper maintained responsibility to identify hazards, enforce safety rules, and maintain safe conditions for everyone on site, including contractors.

11. Defendant Republic Services, Inc. is an environmental services company with a principal place of business in Elizabeth, New Jersey, doing business under the names Clean Venture, Inc. and ACV Enviro, among others (collectively referred to as "Republic"). At all times relevant to this action, Republic was a contractor performing cleaning and maintenance work at the Mill. It maintained independent safety responsibilities under industry standards to identify hazards, protect workers from safety hazards, follow permits and site rules, and stop work when conditions were unsafe.

12. Defendant Zampell Refractories, Inc. ("Zampell") is a company that provides industrial construction and maintenance services with a principal place of business in Newburyport, Massachusetts. At all times relevant to this action, Zampell was a contractor

performing scaffolding and other construction work at the Mill. It maintained independent safety responsibilities under industry standards to identify hazards, protect workers from safety hazards, follow permits and site rules, and stop work when conditions were unsafe.

13. Defendant New England Mechanical Overlay Construction Services, Inc. ("NEMO") is a company that provides industrial boiler repair services and has a principal place of business in Pittsfield, New Hampshire. At all times relevant to this action, NEMO was a contractor performing boiler maintenance services at the Mill. It maintained independent safety responsibilities under industry standards to identify hazards, protect workers from safety hazards, follow permits and site rules, and stop work when conditions were unsafe.

14. Defendant Labor Cleaning Service, Inc. ("Labor Cleaning") is a company that provides industrial cleaning services and has a principal place of business in Bellingham, Massachusetts. At all times relevant to this action, Labor Cleaning was a contractor performing industrial cleaning services at the Mill. It maintained independent safety responsibilities under industry standards to identify hazards, protect workers from safety hazards, follow permits and site rules, and stop work when conditions were unsafe.

### ND Paper's Northern Cyclone and its Known Hazards

15. This case arises from Defendants' disregard for the risks posed by requiring personnel to work within a confined, ultra-hazardous space surrounding the opening of a chimney known as the "Northern Cyclone."

16. Below the opening, the Northern Cyclone chimney has an interior drop of 80 feet straight down to a large industrial boiler that is part of the Mill's cogeneration plant.

17. The area adjacent to the chimney opening, which is accessed from the ninth floor of the Mill, is a permit-required "confined space" under 29 C.F.R. § 1910.146(b).

This means that it is a confined space with one or more of the following characteristics: (1) It contained or had a potential to contain a hazardous atmosphere; (2) It contained a material that had the potential for engulfing an entrant; (3) It had an internal configuration such that an entrant could be trapped or asphyxiated by inwardly converging walls or by a floor which slopes downward and tapers to a smaller cross-section; or (4) It contained any other recognized serious safety or health hazard.

18. The space here presented *all* of these risks, because its proximity to the open end of the chimney meant it had the potential to contain a hazardous atmosphere with dangerously poor air quality and heat; it is a repository for ash and sludge; it is a confined space not intended for continuous human occupation with irregularly shaped walls, sloped floors and ceilings; and it contains an extreme safety hazard—namely, the open end of a chimney that drops eighty feet and nine floors to the boiler below.

19. Ignoring workplace safety requirements, Defendants directed personnel, including Damion, to work in this ultra-hazardous confined space in dangerous proximity to the chimney opening without appropriate operational safeguards, monitoring, or fall protection measures.

20. In violation of industry safety standards, Defendants Jerry-rigged two scaffolding poles designed to run vertically in a horizontal position to serve as makeshift guardrails (see photograph below). However, the scaffolding poles were not designed for this purpose. They were not anchored securely and therefore were foreseeably prone to sliding, moving or becoming dislodged under expected forces and work conditions. In addition, the poles had rough, exposed surfaces that posed risks of cuts and snagging of clothing in an area immediately adjacent to a severe fall hazard. The makeshift design also failed to meet height,

surface, and load-bearing standards for a compliant guardrail system designed to protect against falls.



**The Scaffolding Rail Collapses and Falls**

21. Damion was employed by Strategic Environmental Response Solutions, LLC ("SERS"), a company contracted to provide industrial cleaning and environmental services at the Mill.

22. On May 28, 2025, while working for SERS, Damion was assigned to perform cleaning services on an overnight shift at the Mill.

23. A supervisor employed by Republic directed Damion to clean the permit-required confined space on the ninth floor adjacent to the 80-foot drop down the chimney of the Northern Cyclone.

24. The work required Damion to scrape accumulated ash and debris from the floor using a shovel and then use a hose and water to wash the ash and debris down the opening of the chimney.

25. Industry standards and workplace safety regulations require that any worker inside a confined space be equipped with a retrieval system or mechanical rescue device. Damion was provided with neither.

26. Industry standards and workplace safety regulations require that a worker in the vicinity of a fall hazard be equipped with appropriate fall protection. Here, the only fall "protection" was the makeshift scaffolding rails that did not comply with standards or regulations and were not safe to use in protecting a worker from the fall hazard of working in a confined space in close proximity to an 80-foot drop.

27. Industry standards and workplace safety regulations also require that a properly trained attendant continuously monitor the safety of the worker inside the confined space.

28. Here, the attendant assigned to monitor Damion was not properly trained or experienced and did not continuously monitor Damion while Damion remained within the confined space.

29. When Damion completed the work, he sought confirmation that the work was done to satisfaction. Rather than instructing Damion to exit the confined space, the attendant permitted Damion to remain inside while a supervisor was summonsed.

30. The attendant observed Damion standing inside the confined space, with his hands on the top scaffolding rail in proximity to the chimney opening. The attendant then lost sight of Damion.

31. A short time later, a NEMO supervisor looked through the access opening to the confined space and observed that a scaffolding rail was lying on the floor.

32. The NEMO supervisor asked the attendant whether anyone had been working in the space.

33. The NEMO supervisor notified the attendant that a scaffolding rail was lying on the ground.

34. The attendant called out for Damion but received no response.

35. The attendant then climbed inside the confined space and confirmed that Damion was not there.

36. The initial response was an uncoordinated search, without a confined-space rescue plan, trained attendants, or retrieval equipment.

37. The initial search failed to locate Damion, delaying urgently needed rescue and emergency medical treatment.

38. Approximately thirty minutes after he was first reported missing, Damion was finally discovered 80 feet below the confined space, at the base of the Northern Cyclone chimney.

39. When first responders located him, Damion was on his back, with his head just inside the door used to access the area at the base of the Northern Cyclone chimney (see photograph below).



8

40. First responders found Damion in respiratory failure, requiring placement of a breathing tube. They performed a blood transfusion and transported him by LifeFlight helicopter to Maine Medical Center.

### Damion's Injuries

41. Doctors at Maine Medical Center determined that Damion had suffered multiple, severe, and life-threatening injuries in the fall. These injuries include:

   a. Extensive and severe traumatic brain injury.

   b. Respiratory collapse.

   c. Kidney injury.

   d. Internal bleeding.

   e. Numerous broken bones, including fractures of the 9th-12th ribs, fracture of the collarbone, and multiple broken bones in his back.

42. Damion's catastrophic and permanent brain injuries severely impair his physical and cognitive functioning. He is unable to care for himself, requires guardianship, and has been stripped of his independence and the life he once lived.

43. Damion required prolonged intensive care hospitalization. He will never be able to work, live independently, or function without assistance. He will require ongoing medical treatment, life care services, supervision, and financial support for the remainder of his life.

44. Prior to his injuries, Damion was a husband and father who provided for and supported his family, including his wife, Keyana, and their four children: Damion, 17, Trenton, 15, Madison, 12, and Braxton, 9, all of whom relied on Damion for financial stability, guidance, care, and support that he can no longer provide.

45. Damion has lost the ability to participate meaningfully in family life, including time with his wife and children, daily activities, milestones, and experiences, and to enjoy the relationships that once defined his role as a husband and father.

## The OSHA Investigation

46. Following Damion's fall, the Occupational Safety & Health Association (OSHA) investigated the facts and circumstances of the accident.

47. OSHA issued multiple citations for violations of workplace safety regulations, including the following:

## OSHA Citations Against ND Paper Inc.

48. OSHA cited ND Paper for serious violations of 29 C.F.R. § 1910.29(b)(1), determining that the top edge height of the guardrail was thirty-four (34) inches above the walking-working surface, rather than the required forty-two (42) plus or minus three (3) inches, exposing workers to a fall distance greater than eighty (80) feet.

49. OSHA cited ND Paper for serious violations of 29 C.F.R. § 1910.29(b)(6) based on guardrail systems that were not smooth-surfaced and created hazards of catching or snagging clothing adjacent to a severe fall hazard.

50. OSHA issued ND Paper a repeat citation under 29 C.F.R. § 1910.146(c)(2) for failing to post danger signs or equally effective warnings at permit-required confined-space entrances throughout multiple levels of the cogeneration boiler, including the ninth floor.

51. OSHA found that ND Paper had been cited for this same confined-space standard at the Rumford mill previously, that the prior citation had become a final order, and that ND Paper nonetheless allowed the same violations to recur.

52. OSHA cited ND Paper for violations of OSHA recordkeeping requirements, including failure to adequately review and complete OSHA injury and illness logs prior to certification and posting.

## OSHA Citations Against Republic

53. OSHA cited Republic for serious fall-protection violations under 29 C.F.R. § 1910.29(b)(1) and § 1910.29(b)(6), where employees were exposed to a fall hazard exceeding eighty (80) feet.

54. OSHA cited Republic for multiple serious violations of the permit-required confined-space standard, including violations of 29 C.F.R. § 1910.146(d), (e), (f), (g), (h), and (k), for failures to:

   a. Ensure employees and attendants were properly trained.

   b. Complete confined-space entry permits.

   c. Identify hazards and atmospheric testing results.

   d. Assign and identify attendants and entry supervisors.

   e. Ensure communication between authorized entrants and attendants.

   f. Provide retrieval systems or mechanical rescue devices for entrants exposed to deep vertical confined spaces.

55. OSHA cited Republic for failing to timely provide required OSHA records upon request.

## OSHA Citations Against Zampell

56. OSHA cited Zampell for serious violations of 29 C.F.R. § 1910.29(b)(6), determining that guardrail systems were not smooth-surfaced and posed hazards of cuts, lacerations, and snagging of clothing in an area adjacent to a severe fall hazard.

57. OSHA cited Zampell for recordkeeping violations under 29 C.F.R. § 1904.29(b)(1) related to incomplete OSHA 300 logs.

### OSHA Citations Against Labor Cleaning

58. OSHA cited Labor Cleaning for serious violations of 29 C.F.R. § 1910.30(a)(3)(i) for failing to ensure that employees were trained in the nature of fall hazards in the work area and how to recognize those hazards.

59. OSHA further cited Labor Cleaning for serious violations of 29 C.F.R. § 1910.146(c)(4) and § 1910.146(g)(2) for failing to develop and implement a written permit-required confined-space program and for failing to ensure that employees received confined-space training before being assigned duties involving the permit-required confined space.

### OSHA Citations Against NEMO

60. OSHA cited NEMO for violations of 29 C.F.R. § 1904.29(b)(1) and § 1904.29(b)(4) for failing to properly complete OSHA injury and illness records and for using incident report forms that were not equivalent to OSHA Form 301.

### Count I
### Negligence (All Defendants)

61. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

62. Damion's fall occurred at a multi-employer worksite, pursuant to OSHA Directive CPL 02-00-124, meaning that it was a worksite where employees of multiple employers were present and where more than one employer may be responsible for hazardous conditions affecting worker safety.

63. Each Defendant owed an independent duty to exercise reasonable care to provide a safe workplace within the scope of its respective role at the Mill.

64. As to each Defendant, those duties included identifying foreseeable hazards, complying with applicable OSHA regulations, adhering to recognized industry standards of care, enforcing basic principles of industrial safety, and taking reasonable steps to prevent, control, and/or correct hazardous conditions affecting worker safety.

65. More specifically, as the owner and operator of the Mill, Defendant ND Paper acted as the host and controlling employer and owed a non-delegable duty to exercise reasonable care to identify workplace hazards, establish and enforce safety rules, implement and oversee permit systems, coordinate the activities of multiple contractors, and ensure that hazardous conditions were prevented or corrected, including by stopping unsafe work when necessary.

66. Each contractor Defendant— Republic, Zampell, NEMO, and Labor Cleaning— owed an independent duty to exercise reasonable care in the performance of its work, including identifying hazards associated with its activities, complying with OSHA regulations and site-specific safety requirements, protecting its workers from exposure to known hazards, and stopping work or removing workers from danger when conditions were unsafe.

67. All Defendants breached their duties and failed to follow industry standards and exercise reasonable care in numerous ways, including but not limited to:

    a. Creating and maintaining hazardous conditions that exposed workers like Damion to extreme fall risks.

    b. Failing to provide, maintain, or enforce compliant guardrails and fall-protection systems around an opening with an approximately eighty-foot vertical drop.

    c. Allowing temporary and/or makeshift rails to be displaced, left unsecured, or otherwise rendered ineffective without stopping work or correcting the hazard.

    d.    Permitting employees to work in and around a permit-required confined space without continuous monitoring, a competent attendant, or adequate supervision.

    e.    Failing to properly train, supervise, and support personnel responsible for monitoring confined-space work.

    f.    Allowing Damion to enter and remain within the confined space at all when it was not essential, and when it was foreseeable that doing so presented an extreme risk of serious injury or death due to the open 80-foot drop, and the absence of adequate fall protection, retrieval equipment, or a viable rescue capability.

    g.    Failing to coordinate safety responsibilities and hazard correction among multiple employers at the worksite.

    h.    Exposing workers like Damion to known hazards without implementing adequate fall and confined space protective measures.

    i.    Failing to promptly account for Damion's whereabouts and recognize that he was missing.

    j.    Unreasonably delaying efforts to locate Damion and to notify emergency services despite the known risk of catastrophic injury.

    k.    Violating applicable OSHA standards governing fall protection, permit-required confined spaces, training, supervision, and worksite monitoring.

68. These breaches of duties owed were a direct and proximate cause of Plaintiff's catastrophic injuries and resulting damages.

## Count II
## Negligent Hiring, Training, and Supervision (All Defendants)

69. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

70. Defendants owed a duty to hire, train, supervise, and retain competent employees and contractors capable of safely performing confined-space and elevated work.

71. Defendants breached that duty in numerous ways, including but not limited to:

   a. Failing to properly train workers, attendants, and supervisors on confined-space hazards and fall protection.

   b. Allowing untrained or inadequately trained personnel to supervise or monitor confined-space work.

   c. Failing to ensure adequate staffing and supervision during an overnight shift involving high-risk work.

   d. Failing to implement and enforce effective communication and accountability procedures for workers entering confined spaces.

72. These failures were a direct and proximate cause of Plaintiff's catastrophic injuries and damages.

## Count III
## Premises Liability (ND Paper Inc.)

73. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

74. ND Paper owned, possessed, and controlled the premises where Mr. Hatcher's injuries occurred and owed lawful entrants a duty to maintain the premises in a reasonably safe condition.

75. ND Paper breached that duty in numerous ways, including but not limited to:

   a. Maintaining an unreasonably dangerous opening with an extreme vertical drop without appropriate fall protection.

   b. Failing to correct known fall and confined-space hazards despite prior OSHA citations.

   c. Allowing contractors to perform work around the cyclone opening without adequate safeguards, warnings, or monitoring.

      d.      Failing to coordinate and enforce safety responsibilities at a multi-employer worksite.

      e.      Failing to ensure timely detection and response when a worker disappeared into a hazardous area.

76. ND Paper's failures were a direct and proximate cause of Plaintiff's catastrophic injuries and damages.

## Count IV
### Loss of Consortium (All Defendants)

77. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

78. As a result of the negligence and harm detailed above, Keyana Edwards has suffered loss of consortium.

## Count V
### Punitive Damages (All Defendants)

79. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

80. Defendants acted with express or implied malice by deliberately acting, or deliberately failing to act, in a manner so outrageous that malice toward those foreseeably injured can be inferred, including by consciously disregarding an obvious and extreme risk of death or catastrophic injury through the following acts and omissions:

      a.      Continuing unsafe confined-space practices despite prior OSHA citations and enforcement actions that placed Defendants, including ND Paper, on actual notice of confined-space hazards and regulatory requirements.

      b.      Knowingly allowing work to proceed in and around a permit-required confined space with an inadequately guarded opening presenting a known multi-story fall hazard.

    c.    Failing to stop work or correct hazardous conditions after supervisors and other responsible personnel observed that critical fall-protection components had failed or were noncompliant.

    d.    Knowingly failing to implement or enforce basic confined-space monitoring, rescue, and retrieval procedures required by OSHA regulations and industry standards.

    e.    Unreasonably delaying the discovery of Mr. Hatcher after his fall, delaying rescue efforts, and delaying notification of emergency services, despite the foreseeable risk of serious injury or death inherent in confined-space incidents.

81. Defendants' deliberate conduct, as alleged herein, was so outrageous and reckless that malice may be implied under Maine law, and supports an award of punitive damages to punish Defendants' conduct and to deter similar conduct in the future.

WHEREFORE, Plaintiff seeks judgment for past and future medical expenses, lost earnings and earning capacity, pain, suffering, loss of enjoyment of life, emotional distress, mental anguish, permanent impairment, punitive damages, loss of consortium, interest, costs, attorney fees and such other relief as the Court deems just and equitable.

### Demand for Jury Trial

Plaintiff hereby requests that her claims be tried by a jury.

Date: February 19, 2026

                                                                         <u>/s/ Benjamin R. Gideon, Esq.</u>

                                                                         Benjamin R. Gideon, Esq.  
                                                                         Maine Bar No.: 9419  
                                                                         Meryl E. Poulin, Esq.  
                                                                         Maine Bar No.: 5960  
                                                                         Stephanie J. Mills, Esq.  
                                                                         Maine Bar No.: 9937  
                                                                         Gideon Asen LLC  
                                                                         95 Main Street, 4th Floor  
                                                                         Auburn, ME  04210  
                                                                         Attorneys for Plaintiff  
                                                                         service@gideonasenlaw.com